## KANSAS CITY LIFE INS. CO. et al. v. CHICOT COUNTY DRAINAGE DIST. et al.

(Circuit Court of Appeals, Eighth Circuit. April 6, 1925.)

No. 6694.

**Drains ⬅⟞91—Evidence held to establish that lands were of such elevation and so located that they would receive no benefits.**

Evidence *held* to establish that lands subject to drainage assessment were of such elevation and so located that they would receive no benefits.

Appeal from the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Suit by the Kansas City Life Insurance Company and others against the Chicot County Drainage District of Chicot County, Ark., and others. From a decree of dismissal, plaintiffs appeal. Reversed and remanded, with directions.

J. H. Carmichael, of Little Rock, Ark. (Frank W. McAllister, of Kansas City, Mo., and G. W. Hendricks, of Little Rock, Ark., on the brief), for appellants.

G. B. Rose, of Little Rock, Ark. (D. H. Cantrell, J. F. Loughborough, and A. W. Dobyns, all of Little Rock, Ark., on the brief), for appellees.

Before SANBORN and LEWIS, Circuit Judges, and POLLOCK, District Judge.

LEWIS, Circuit Judge. This is a suit to enjoin the collection of assessments in the sum of $171,175.00, made by the Chicot County Drainage District as special benefits to 10,320 acres of land in Chicot county, Ark. It was brought by a receiver appointed by the court below of the property of Sunny Side Company, owner of the land,

and by Kansas City Life Insurance Company, owner of more than $200,000.00 in bonds or notes secured by mortgage on the land, a foreclosure suit brought by the mortgagee being then pending in said court. It is alleged that the drainage system which the drainage district proposed to construct with money to be raised by assessments on lands within the district would be of no benefit whatsoever to the 10,320 acres, and that to compel payment of the amount assessed, or any part thereof, on these lands would result in taking property of plaintiffs without compensation and in confiscation, in' violation of plaintiffs' rights, that the assessments made or about to be made would be prior in right or lien to the mortgage.

The answer pleads two defenses: First, that numerous drainage operations in Lincoln and Desha counties were about to precipitate upon the lands in Chicot county a prodigious volume of water, rendering the lands of plaintiffs unfit for cultivation and incapable of local drainage, and that the plan of defendants provided for taking care of this water and would result beneficially to plaintiffs' lands to the extent of the assessments; second, that the lands were assessed in the manner required by the Act incorporating the district and the assessments confirmed more than thirty days before the bringing of this suit, by reason of which plaintiffs were precluded from any relief.

On final hearing the court, in dismissing the bill, said:

"So the question we are called upon to determine is whether the facts in this case show that there is no benefit either direct or indirect to the land in controversy, or if indirect, that it is so remote that it is purely speculative." Kansas City So. Ry. Co. v. Road Imp. District, 256 U. S. 658, 41 S. Ct. 604, 65 L. Ed. 1151; Valley Farms Co. v. County of Westchester, 261 U. S. 155, 43 S. Ct. 261, 67 L. Ed. 585; Kansas City Ry. v. Road District, 266 U. S. 379, 45 S. Ct. 136, 69 L. Ed. ——.

And thereupon the court held that the facts did not overcome the presumption arising from the assessments, that the lands would receive benefits. The case made by plaintiffs on the facts was not that all of the 10,320 acres would not receive benefits, but that parts of the tract would not receive benefits, some being at too high an altitude and some too low to be at all affected by the proposed improvement; and we think that claim was clearly established and that the court fell into error when it denied plaintiffs any relief.

It appears that a very large territory adjoining and north of Chicot county that had found drainage outlets into the Mississippi River has been cut off by a levee constructed along the west bank of the river. Thereupon the territory north, said to cover Desha and a part of Lincoln counties, formed drainage districts which will carry the accumulated waters south on to Chicot county, and the drainage district with which we are concerned was organized to rid itself of those waters. The president of the board of commissioners of the district stated its purpose in his testimony:

"This district was not organized for the purpose of draining anybody's land, but for the purpose of establishing two great systems of ditches, for the purpose of taking care of the water that will practically ruin all the land in Chicot county, if it is not carried on through, and also to enable us to drain into this system later on through other drainage districts. It is not a system to drain anybody's land in particular; just to construct two big arteries. * * * The purpose of this district is to take care of the great volume of water that is brought down the ditches from the counties above us, and incidentally to take care of our rainfall too."

The proposed system makes provision for gathering the waters in the northerly part of the district into several artificial ditches of large proportions and emptying them into Lake Macon. The area, including that in Desha and Lincoln counties, thus to be drained into Lake Macon is said to be about 650 square miles, and the discharge into Lake Macon will be at times about 12,000 second feet. It is proposed by the plan to conduct the waters on to the south from Lake Macon by dividing them there in two equal proportions, approximately 6,000 second feet to be taken through a ditch southwesterly to the Bœuf River, the remainder to Lake Chicot, some twelve miles to the south, through a ditch which now connects the two lakes but which is to be greatly enlarged and a control of the flow installed at the outlet of Lake Macon. The present outlet of Lake Chicot to the south now has a capacity of 500 second feet which is to be enlarged under the plan to 2,400 second feet; and that flow emptied into the Bœuf River lower down, because the river would not retain it higher up. In this way the regulated inflow and outflow of Lake Chicot will cause the surface of its waters to fluctuate in elevation between 114 and 118, counting from the Memphis datum. That is the plan. Of course it does not contemplate very excep-

tional years of extreme floods and breaking of levees, which have at times swept over the lakes and inundated the whole country thereabout. Lake Chicot is about 20 miles long, 3,000 feet wide, and is in the shape of a crescent, with its two horns extending easterly to the levee along the western bank of the Mississippi River. There are about 16,000 acres within the crescent, and the lands here involved compose the greater part of that tract. In seeming contradiction they are referred to as lying on an island, and as lying within the bed of a lake. They are said to be on an island because they are almost completely surrounded by the lake and river, and they are said to be the bed of a lake because they form a basin, there being a gradual decline in elevation from the rim of the lake and from the western bank of the river, causing the center of the tract to be several feet lower than its outer boundaries. There are two small lakes in or near the center and also considerable swamp land covered with timber. There are about 7,000 acres of cultivatable land in the tract in question, which lies next to the rim of the lake and the river, around the center. Counting from the Memphis datum, about 3,280 acres of the 7,000 is 128 or more in elevation. The lake, under conditions as they have heretofore existed, does not ordinarily rise above 119. Its minimum has been about 114, and that is substantially the elevation of the lowest lands within the crescent. There is some conflict in the testimony as to what elevation the waters of the lake would have to reach in order to overflow on its easterly side, appellants' witnesses putting it at 128 and appellees' witnesses contending that at some places the lake bank is lower, permitting overflow at 121.4. Witnesses who have been familiar with the situation for many years and who had lived upon and cultivated these lands testified that there were some 3,000 acres in the tract that were not affected by high water, that there was unusually high water in 1920 and only about 70 acres were lost from cultivation on that account. One of them testified that he had known the place intimately for 20 years, that during that time the highest water was in 1912, a levee broke; but there was a considerable portion of these lands not under water, that he drove over the plantation in a buggy, whereas he went from Lake Village to Montrose, a distance of 12 miles across country, in a skiff, that in 1916 another levee broke and the water was almost as high as in 1912, lacking a few inches, but it did not interfere with cultivation and practically all of the cultivatable

land was worked. This testimony was uncontradicted. There is also testimony strongly indicating that elevations westerly toward the Bœuf River from the lake are lower than the overflow points on the easterly side of the lake and that because of this, flood waters coming from the north would overflow the country west of the lake and never reach a height in the lake to overflow its easterly banks. Ordinarily, high water in Lake Chicot does not stand above 119, and its minimum level is 114. It did, however, reach 128 in 1912 and 121 in 1921, but no one testified that he had ever seen the lake overflow on its easterly side. Flood waters can only reach the lands in question by overflow from the lake or by breaking through the levee along the westerly bank of the river.

It is contended that when the system is put through it will permit the drainage of the lower lands on the east side of the lake into the lake. We do not see how that may be so, inasmuch as the proposed plan will not reduce the waters in the lake to a lower minimum level than they now have, nor how the swamp lands in the tract could receive any benefit if protected from overflow by the system. There are drainage ditches leading from some of the lower lands into the lake, but when the waters in the lake reach those levels the ditches are closed. On the whole, we are convinced from this record that much of the land lies at such elevation that the system when completed will be of no benefit to it. The accumulated waters, if they passed over the lake, would not reach it. As to the remainder of the tract, the physical situation is such that we think the facts do not afford a basis for intelligent decision. Those lands may need the proposed protection, which the higher lands do not need, from the accumulated waters which the system is designed to handle through the lake; and the system may provide a way by which the remaining lands or a part of them may be improved by drainage into the lake. Whether those advantages or either will be thus brought about does not appear from the record. There is to be no substantial change in the minimum elevation of the lake, and we doubt the claim that the system will afford a means of draining into the lake the swamp and low lands that have an elevation of 114.

When appellees offered proof under their second defense the court announced it would disregard such proof. Counsel for appellees now insist that the tendered proof, rejected by the court and not in the record, would have barred this suit in toto under the provisions of the State statutes as construed by

the State supreme court. Bush v. Road Imp. Dist., 141 Ark. 254, 216 S. W. 690; House v. Road Imp. Dist., 158 Ark. 344, 251 S. W. 12. We express no opinion on the point, the necessary facts are not before us, but as the decree must be reversed we direct that the offered proof be admitted. If the second defense is found to be good the bill will be dismissed, of course. If not, collection of the assessments on the 3,000 or so acres of the higher land will be enjoined, which will require an ascertainment of a proper description of that land, in such way as the court may direct. As to the remainder of the tract, excluding the 3,000 acres, the case will be open for further proof as the parties may be advised on all issues.

It is so ordered.